1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Joel D. Smith (State Bar No. 244902)
Frederick J. Klorczyk III (State Bar No. 320783)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail:  ltfisher@bursor.com
          jsmith@bursor.com
          fklorczyk@bursor.com

**BURSOR & FISHER, P.A.**
Scott A. Bursor (State Bar No. 276006)
888 Seventh Avenue
New York, NY  10019
Telephone: (212) 989-9113
Facsimile: (212) 989-9163
E-Mail: scott@bursor.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HAROLD BROWER, ASHLEY MISTLER and JUDI TALILI, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>WELSPUN INDIA, LTD.,<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

1    Plaintiffs Harold Brower, Judi Talili, and Ashley Mistler, by their attorneys, make the

2    following allegations pursuant to the investigations of counsel and upon information and belief,

3    except as to the allegations specifically pertaining to themselves and their counsel, which are based

4    on personal knowledge.

5                                    **NATURE OF THE ACTION**

6    1.    This is a class action against Welspun India Ltd. ("Welspun") for distributing,

7    marketing, and selling Welspun bed linens that, despite being labeled as "100% Egyptian cotton,"

8    were not 100% Egyptian cotton.  Egyptian cotton linens command a premium in the market due to

9    their superior quality, durability, and association with luxury products.  Welspun's "100%

10   Egyptian Cotton" linens, however, are made with less expensive and inferior non-Egyptian cotton

11   and are pawned-off to consumers at a substantial premium over other cotton linens that are not

12   labeled 100% Egyptian cotton.

13   2.    Labeling a product as "100% Egyptian cotton" when it is made from other types of

14   cotton violates federal and state laws, including the Textile Fiber Products Identification Act, 15

15   U.S.C. § 70 *et seq*. (the "Textile Act"), which prohibits companies from misrepresenting the origin

16   of cotton in cotton products.  It is likewise unlawful under the Textile Act to sell, offer to sell,

17   advertise, deliver, or transport any textile fiber product which is misbranded or falsely or

18   deceptively advertised.

19   3.    Because Plaintiffs and the proposed class members have been damaged by the false

20   labeling of Welspun products, Plaintiffs bring this action seeking for themselves, and all other

21   similarly situated purchasers of Welspun linen products, compensatory damages, restitution,

22   injunctive relief, statutory damages, and punitive damages.

23                                        **THE PARTIES**

24   4.    Plaintiff Harold Brower is a citizen of California, residing in Escondido.  In or about

25   March 2016, Mr. Brower purchased Welspun-made, "Fieldcrest" brand linens labeled "100%

26   Long-Staple Egyptian Cotton" from a Target store in California.  Prior to purchasing the bed

27   linens, Mr. Brower reviewed the product packaging, which prominently stated on the front of the

28

package that the product was "100% Long-Staple Egyptian Cotton."  Mr. Brower read and relied on the representation that the bed linens were made from 100% long-staple Egyptian cotton, and understood them to be representations and warranties that the product was, in fact, made only of Egyptian cotton.  Mr. Brower relied on these representations and warranties in deciding to purchase the bed linens, and he would not have purchased the product if he had known that the product was not 100% long-staple Egyptian cotton.  Mr. Brower purchased the product at a substantial price premium expecting that it would be made from 100% long-staple Egyptian cotton.  He also understood that the purchase involved a direct transaction between himself and Welspun, because his purchase came with Welspun's representation that the product was, in fact, 100% long-staple Egyptian cotton.

5. Plaintiff Judi Talili is a citizen of California, residing in Santa Ana.  In or about 2014, Ms. Talili purchased Welspun-made, "Perfect Touch" brand linens labeled "100% Egyptian Cotton" from a BB&B store in California and Welspun-made, "Fieldcrest" brand linens labeled "100% Long-Staple Egyptian Cotton" from a Target store in California.  Prior to purchasing the bed linens, Ms. Talili reviewed the product packaging, which prominently stated on the front of the package that the products were "100% Egyptian Cotton" or "100% Long-Staple Egyptian Cotton."  Ms. Talili read and relied on the representation that the bed linens were made from 100% Egyptian cotton, and understood them to be representations and warranties that the products were, in fact, made only of Egyptian cotton.  Ms. Talili relied on these representations and warranties in deciding to purchase the bed linens, and she would not have purchased the products if she had known that they were not 100% Egyptian cotton.  Ms. Talili purchased the products at a substantial price premium expecting that they would be made from 100% Egyptian cotton.  She also understood that the purchase involved a direct transaction between herself and Welspun, because her purchase came with Welspun's representation that the product was, in fact, 100% Egyptian cotton.

6. Plaintiff Ashley Mistler is a citizen of California, residing in West Sacramento.  Ms. Mistler purchased Welspun-made, "Fieldcrest" brand linens labeled "100% Long-Staple Egyptian Cotton" from a Target store in California in 2016.  Ms. Mistler also purchased Welspun-made,

"Better Homes and Gardens" brand linens labeled "100% Egyptian Cotton" from a Walmart store in California in 2016.  Prior to purchasing the bed linens, Ms. Mistler reviewed the product packaging, which prominently stated on the front of the package that the product was "100% Long-Staple Egyptian Cotton" or "100% Egyptian Cotton."  Ms. Mistler read and relied on the representation on the product packaging, and understood them to be representations and warranties that the product was, in fact, made only of Egyptian cotton.  Ms. Mistler relied on these representations and warranties in deciding to purchase the bed linens, and she would not have purchased the product if she had known that the product was not made only of Egyptian cotton.  Ms. Mistler purchased the product at a substantial price premium expecting that they would be made only from Egyptian cotton.  She also understood that the purchases involved a direct transaction between herself and Welspun, because her purchases came with Welspun's representation that the products were, in fact, 100% Egyptian cotton

7.      Defendant Welspun India Ltd. is a textile company based in Mumbai, India.  It is one of the world's largest textile manufacturers.  More than 68 percent of its production is exported to the United States.  Welspun India Ltd. states that it has "strategic partnerships with leading global retailers," "collaborates with top retailers," and "supplies to 17 of the Top 30 global retailers."  Welspun India Ltd. does business throughout the United States and within this District, including by supplying textile products and working directly with United States retailers on textile product labeling and marketing.  Welspun India Ltd. works with and supplies textile products to retail stores in California such as Bed Bath & Beyond, Target and Walmart.  Welspun India Ltd. has derived substantial revenue from its contacts with California, such that it expected or reasonably should have expected that its acts would have consequences in California.

## JURISDICTION AND VENUE

8.      This Court has personal jurisdiction over Defendant.  Defendant purposefully avails itself of the California consumer market and regularly and purposefully distributed fake Egyptian cotton products to hundreds of locations within this County and thousands of retail locations throughout California, including Bed Bath & Beyond, Target, and Walmart.  Defendant not only had

an expectation of true national distribution, but also wanted, expected and knew that its products would be sold in California, one of the largest markets in the United States.  Welspun India touts itself as India's "largest exporter of home textile products" and was "ranked #1 in Home Textile Supplier Giants to USA by Home & Textiles Today magazine for the 5th year in a row."  Every 5th towel and every 9th bedsheet sold in the United States is manufactured by Defendant.  Seventy percent of its revenues come from the U.S. markets.

9.      This Court has subject-matter jurisdiction over this proposed class action pursuant to 28 U.S.C. § 1332(d), which, under the provisions of the Class Action Fairness Act ("CAFA"), explicitly provides for the original jurisdiction of the federal courts in any class action in which at least 100 members are in the proposed plaintiff class, any member of the plaintiff class is a citizen of a State different from any defendant, and the matter in controversy exceeds the sum of $5,000,000.00, exclusive of interest and costs.  Plaintiffs allege that the total claims of individual members of the proposed Class (as defined herein) are well in excess of $5,000,000.00 in the aggregate, exclusive of interest and costs.

10.     Venue properly lies in this District pursuant to 28 U.S.C. § 1391(b)(2) because Plaintiff Brower resides in this District and a substantial part of the events or omissions giving rise to the claim occurred in this District.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391(c)(3) because Welspun, as a non-resident of the United States, "may be sued in any judicial district."

## FACTS COMMON TO ALL CAUSES OF ACTION

### I.      Egyptian Cotton Is Prized For Its Durability, Softness And Quality

11.     Egyptian cotton (i.e., *gossypium barbadense* cotton grown in Egypt) is considered to be some of the highest-quality cotton in the world.  A combination of climate and cultivation methods used in Egypt result in Egyptian cotton having longer cotton fibers (or "staples") than other types of cotton.  In general, the longer the fiber, the higher quality the fabric because longer fibers translate into more uninterrupted fiber to use when making yarn and threads.  This feature results in fewer splices and a stronger, more durable fabric.  Standard cotton sheets, in contrast, use

shorter fibers that are twisted and combined to produce the right length – a process that results in a weaker weave and a product that is more susceptible to wear, tear, and shredding.

12. Longer fibers also generate finer yarn, which in turn allows manufacturers to pack more thread counts into each square inch. Hence, Egyptian cotton linens are softer and more lustrous than linens made of other types of cotton.

13. Egyptian cotton also is more porous than regular cotton, which makes Egyptian cotton sheets more comfortable to sleep on than standard cotton or polyester sheets because they absorb moisture better. Egyptian cotton also absorbs dye more thoroughly than regular cotton, allowing for richer colors that resist fading longer.

14. 100% Egyptian cotton linens are widely regarded as the highest-quality option on the market when it comes to high-end linens, and consumers pay a substantial premium for 100% Egyptian cotton linens.

15. Although cotton is one of Egypt's most well-known exports, only a small percentage of all cotton produced in the world comes from Egypt. That percentage has steadily declined over the last decade due to reductions in government subsidies, and recent economic and political instability has exacerbated the problem. According to a U.S. Department of Agriculture report, cotton production in Egypt experienced a "jaw-dropping decline" of 50 percent in 2016, compared to 2015.[1] With the supply of Egyptian cotton dwindling, unscrupulous businesses have resorted to pawning-off non-Egyptian cotton as Egyptian cotton. The Cotton Egypt Association, a non-profit trade association in Egypt, reports that it conducted random DNA tests of home textiles sold in retail stores in the United States and other countries, and found that 90 percent of the products tested contained no Egyptian cotton, despite being labeled as such.

---

[1] Beyond All Expectations: Egypt's 2016 Cotton Production Set to Plummet. U.S.D.A. Foreign Agricultural Service, June 7, 2016, *available at* http://gain.fas.usda.gov/R ecent%20GAIN%20Publications/Beyond%20All%20Expectations%20Egypt%E2%80%99s%2020 16%20Cotton%20_Cairo_Egypt_6-7-2016.pdf

II.     **Selling, Advertising, Delivering, Or Transporting Cotton Mislabeled As "Egyptian Cotton" Violates The Textile Fiber Products Identification Act And Federal Regulations Governing The Labeling Of Cotton Products**

16.     The Textile Fiber Products Identification Act ("Textile Act"), 15 U.S.C. § 70 *et seq.*, governs labeling and advertising of textile products, and provides:

> The introduction, delivery for introduction, manufacture for introduction, sale, advertising, or offering for sale, in commerce, or the transportation or causing to be transported in commerce, or the importation into the United States, of any textile fiber product which is misbranded or falsely or deceptively advertised . . . is unlawful, and shall be an unfair method of competition and an unfair and deceptive act or practice in commerce under the Federal Trade Commission Act [15 U.S.C.A. § 41 et seq.].

15 U.S.C. § 70a(a).

17.     The Textile Act further provides:

> The sale, offering for sale, advertising, delivery, transportation, or causing to be transported, of any textile fiber product which has been advertised or offered for sale in commerce, and which is misbranded or falsely or deceptively advertised . . . is unlawful, and shall be an unfair method of competition and an unfair and deceptive act or practice in commerce under the Federal Trade Commission Act [15 U.S.C.A. § 41 et seq.].

*Id.* at § 70a(b).

18.     Under the Textile Act, the term "textile fiber product" includes "any household textile article made in whole or in part of yarn or fabric." *Id.* at § 70(h)(3).  Cotton linen is a "textile fiber product" within the meaning of the Textile Act.

19.     The Textile Act further provides that a textile fiber product "shall be misbranded if it is falsely or deceptively stamped, tagged, labeled, invoiced, advertised, or otherwise identified as to the name or amount of constituent fibers contained therein."  *Id.* at § 70b(a).

20.     The Federal Trade Commission ("FTC") has promulgated rules governing the labeling of textile products.  Under 16 C.F.R. § 303.16(a), a label must disclose the "generic name" of the constituent fibers of a product (such as "cotton").  Under 16 C.F.R. § 303.16(d), additional

descriptive terms (such as "Egyptian cotton") may be included on the label, but only if they are "non-deceptive" and "are properly and truthfully descriptive" of the fiber used in the product. Under 16 C.F.R. § 303.27, "the word 'All' or the term '100%' may be used in labeling, together with the correct generic name of the fiber and any qualifying phrase [i.e., 100% Egyptian cotton]," only if the product "is comprised wholly" of that fiber.

21.     Defendant is required to comply with the Textile Act.

**III.    Welspun Markets And Sells Bed Linens Labeled As "100% Egyptian Cotton" In Major Retailers Across The United States**

22.     Welspun manufactures, markets, and sold linens that are purportedly "100% Egyptian Cotton" or "100% Long-Staple Egyptian Cotton" in the United States under the Fieldcrest, Crowning Touch, Perfect Touch, Better Homes and Gardens, Biltmore, Charisma, Royal Velvet, and Canopy brands, among others (collectively, the "Affected Bed Linens"). Welspun's "100% Egyptian Cotton" or "100% Long-Staple Egyptian Cotton" linens are sold online and in major retail stores across the United States, including at Walmart, BB&B, and Target. The Affected Bed Linens include, among others, the following products:

     a.   Fieldcrest 500 thread count "100% Long-Staple Egyptian Cotton" bed linens;

     b.   Better Homes and Gardens 400 thread count "100% Egyptian Cotton" bed linens;

     c.   Canopy 400 thread count damask stripe "100% Egyptian Cotton" bed linens;

     d.   Crowning Touch 500 and 800 thread count "100% Egyptian Cotton" bed linens;

     e.   Perfect Touch 625 thread count "100% Egyptian Cotton" bed linens; and

     f.   Royal Velvet 400 thread count "100% Egyptian Cotton" bed linens.

23.     The Affected Bed Linens are all substantially similar.  Each Affected Ben Linen is manufactured by Welspun and prominently displays the words "100% Egyptian Cotton" or "100% Long-Staple Egyptian Cotton" on its packaging, but each is made of non-Egyptian cotton. Accordingly, each Affected Bed Linen is misrepresented as "100% Egyptian Cotton" or "100% Long-Staple Egyptian Cotton."  Affected Linens include all Egyptian cotton linens manufactured by Welspun and sold in the United States.

24.     For example, the front packaging of Fieldcrest brand linens purportedly made from Egyptian cotton uniformly states "100% Long-Staple Egyptian Cotton:"



25.     Similarly, the front packaging of Better Homes and Gardens brand linens purportedly made from Egyptian cotton uniformly states "Egyptian Cotton," and again states "100% Egyptian Cotton" in the lower front portion of the packaging:



26.     The front packaging of Canopy brand linens purportedly made from Egyptian cotton also uniformly states "100% Egyptian Cotton:"



27.     The front packaging of Crowning Touch 500 thread count linens purportedly made from Egyptian cotton also uniformly states "100% Egyptian Cotton:"



28.     The front packaging of Perfect Touch brand linens purportedly made from Egyptian cotton uniformly states "100% Premium Egyptian Cotton," and also states "100% Egyptian Cotton on the back of the packaging:



29.     Other Affected Bed Linens are also labeled "100% Egyptian Cotton" or "100% Long-Staple Egyptian Cotton" on the packaging, but are not made from Egyptian cotton.

30.     By marketing, labeling, and selling the Affected Bed Linens as "100% Egyptian Cotton" or "100% Long-Staple Egyptian Cotton," Defendant was able to sell the Affected Bed Linens at a significant premium compared to bed linens not labeled as "100% Egyptian Cotton."

## IV.    Welspun Admitted That The Affected Bed Linens Were Mislabeled And That It Must "Take Responsibility For It"

31.     In December 2015, Target began an investigation into whether Welspun substituted non-Egyptian cotton in its Fieldcrest label bed linens sold in Target stores.  On August 19, 2016, Target announced that it had confirmed that "Welspun substituted another type of non-Egyptian

cotton when producing [Fieldcrest] bed linens between August 2014 and July 2016."  Target also announced that it was terminating its relationship with Welspun and phasing out all Welspun products.

32.     In the wake of Target's announcement, other major U.S. retailers began their own investigations into whether sheets they buy from Welspun contain Egyptian cotton.  On approximately August 24, 2016, BB&B announced its own audit of Welspun.  Approximately three months later, BB&B announced that it would no longer sell its bed linens labeled "100% Egyptian Cotton" because Welspun could not guarantee that its products were made from Egyptian cotton.

33.     On September 9, 2016, Walmart announced that it too would stop selling Egyptian cotton sheets made by Welspun and donate all of the sheets currently on its shelves.

34.     Although Target, Walmart and BB&B offered refunds for the Affected Products sold in their stores, the refund policies were limited in time, received little publicity, and imposed restrictions many customers could not satisfy.

35.     In response to these retailers' announcements, Welspun admitted to its unlawful conduct.  At an August 22, 2016 call with investors, Welspun's Managing Director Rajesh Mandawewala stated that, "without any ambiguity the fault is on our side and so it is, let's say, the error is from our side so I guess we have to take responsibility for it."[2]  Similarly, in December 2016, the Chairman of Welspun Group, BK Goenka, stated that Welspun "did accept our mistake," and later said that "admitting to the entire world that you are at fault is not easy."[3]

36.     After Welspun's fraud was exposed, Welspun falsely claimed that the substitution was just a mistake, and the result of inadequate supply chain management.  For example, when

---

[2] Transcript, Welspun India Conference Call – Recent Business Developments, August 22, 2016, *available at* http://corporates.bseindia.com/xml-data/corpfiling/AttachLive/ 445CCBBC_BEE2_42A4_8384_A6CD00303F80_093036.pdf

[3] Welspun Tries to Make a Comeback and Gain Ties With Other Retailers, Indian Retailer.com, Dec. 15, 2016, *available* at http://retail.franchiseindia.com/news/Welspun-tries-to-make-a-comeback-and-gain-ties-with-other-retailers.n6868/.; Sujata Reddy, *Admitting Our Fault was a Game-Changer:  BK Goenka on Welspun vs. Target Crisis*, The Economic Times, June 2, 2017, *available at* http://economictimes.indiatimes.com /magazines/ panache/admitting-our-fault-was-a-game-changer-bk-goenka-on-the-welspun-vs-target-crisis/articleshow/58955424.cms (attached hereto as Exhibit B).

asked whether "heads would roll" over the scandal, the Welspun Group's Chairman B.K. Goenka claimed, "Honestly, it was a system failure.  So it's not like I could catch someone and blame them."[4]  In fact, current and former Welspun employees confirmed that Welspun India Ltd. purposefully used cheaper, non-Egyptian cotton for its Egyptian cotton sheets, and forged invoices and doctored other records to make it appear that Welspun used Egyptian cotton when it did not. Meanwhile, Welspun and its subsidiaries misrepresented that the Affected Products were made from genuine Egyptian cotton, prepared false labeling for the Affected Products, and distributed, transported and sold falsely labeled Affected Products.

**V.    Welspun's Counterfeiting Practices Extend As Far Back As 2008, At Least**

37.    In 2008, a Walmart employee expressed concerns that Welspun was supplying Walmart with fake Egyptian cotton sheets and that Walmart employees may have been colluding with Welspun.  An ensuing investigation exposed systematic fraud by Welspun.  Yet Walmart buried the results of that investigation and continued to market, sell, and deliver Welspun products labeled "100% Egyptian Cotton."  A former Walmart executive who played a lead role in the 2008 investigation of Welspun was later linked to a 2014 scandal over Walmart's cover-up of a vast bribery scheme in Mexico.

38.    In January 2016, a whistleblower-employee of Welspun contacted Target saying Welspun had asked him or her to falsify invoices to make it appear that Welspun used Egyptian cotton when it did not.[5]  During an investigation that followed, a third-party Egyptian cotton vendor later confirmed to Target that Welspun had passed-off a forged invoice purporting to show Welspun had purchased cotton from that vendor.  Target remained in contact with the whistleblower for at least seven months.  The whistleblower disclosed that Welspun did not purchase enough Egyptian cotton to meet the needs of any of its retailers, had a history of

---

[4] The Economic Times, June, 2, 2017.  https://economictimes.indiatimes.com/magazines/ panache/admitting-our-fault-was-a-game-changer-bk-goenka-on-the-welspun-vs-target-crisis/articleshow/58955424.cms

[5] The whistleblower is referenced here has "him or her" because he/she expressed fear of personal harm or retribution by Welspun or those sympathetic to Welspun if he/she is identified.  The whistleblower is one of a handful of people who have expressed fear that Welspun would resort to violence in connection with its counterfeiting activities.

falsifying invoices, and implicated other U.S. retailers who sold Welspun-made Egyptian cotton sheets.

39.     Later, another Welspun employee (not the whistleblower) told a Target employee in India that Welspun used non-Egyptian cotton for Target's products.  The same Target employee then stole a trove of incriminating documents from Welspun and passed them on to other Target employees.  When Target finally told Welspun India Ltd.'s CEO Dipali Goenka what it had found, she privately did not deny the fraud, but publicly misrepresented that the cotton substitution was an innocent mistake, and implied that third-party cotton suppliers were to blame.[6]

40.     In August 2015, BB&B learned that its Welspun-made Perfect Touch sheets were in fact not made with Egyptian cotton, but BB&B took no action at that time.  Later in 2016, BB&B attempted to audit Welspun's factory in Anjar, India.  Welspun obstructed the audit and denied access to documents necessary to confirm the authenticity of Perfect Touch sheets sold by BB&B. Although BB&B stopped selling Welspun-made Perfect Touch Egyptian cotton sheets, it continued to do business with Welspun.

41.     The Welspun-made Perfect Touch sheets that BB&B sold also had another problem: they were made with 3% spandex, despite being labeled 100% Egyptian cotton.

### CLASS ACTION ALLEGATIONS

42.     Plaintiffs seek to represent a class defined as all persons in California who purchased Affected Bed Linens labeled "100% Egyptian Cotton" or "100% Long-Staple Egyptian Cotton" during the class period.  Excluded from the Class are Welspun, its affiliates, employees, officers and directors, persons or entities that purchased Affected Bed Linens for resale, and the Judge(s) assigned to this case.

43.     Plaintiffs reserve the right to amend the above class definitions as appropriate after further investigation or discovery, including by seeking to certify a narrower multi-state class (or classes) in lieu of a nationwide class if appropriate.

---

[6] Forbes India, May 12, 2017, "Welspun India: Out of the woods."
http://www.forbesindia.com/article/8th-anniversary-special/welspun-india-out-of-the-woods/46931/1

44.     The members of the Classes are so numerous and widely dispersed that joinder of all members is impracticable.  On information and belief, millions of Class members have purchased Affected Bed Linens mislabeled as "100% Egyptian Cotton" or "100% Long-Staple Egyptian Cotton."  The precise number of Class members and their identities are unknown to Plaintiffs at this time but may be determined through discovery.  Class members may be notified of the pendency of this action by mail, email, and/or publication through the distribution records of Welspun and third party retailers and vendors.

45.     Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

    a.  Whether Defendant breached an express warranty made to Plaintiffs and the Class;

    b.  Whether Defendant advertised or marketed Affected Bed Linens in a way that was false or misleading;

    c.  Whether Defendant's conduct was false, misleading, or reasonably likely to deceive ordinary consumers;

    d.  Whether Class members have been injured by Defendant's conduct;

    e.  Whether Class members suffered an ascertainable loss as a result of Defendant's misrepresentations;

    f.  Whether Class members are entitled to damages, restitution, injunctive relief, and/or monetary relief and, if so, the amount and nature of such relief;

    g.  Whether Defendant violated California Civil Code §§ 1750, *et seq.*;

    h.  Whether Defendant violated California Business & Professions Code §§ 17200, *et seq.*;

    i.  Whether Defendant violated California Business & Professions Code §§ 17500, *et seq.*

46.     The claims of the named Plaintiffs are typical of the claims of the Class in that the named Plaintiffs purchased one or more Affected Ben Linens.

47.     Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the Class or Subclass members they seek to represent.  Plaintiffs also have retained competent counsel experienced in prosecuting class actions, and intend to prosecute this action vigorously.  The interests of Class members will be fairly and adequately protected by Plaintiffs and their counsel.

48.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of the Class members.  The monetary value of each individual Class member's claim is small compared to the burden and expense of individual litigation.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.  Judicial economy is served by litigating the Class claims in one case.

## COUNT I
**Violation Of California's Consumers Legal Remedies Act ("CLRA"),**
**California Civil Code §§ 1750,** *et seq.*

49.     Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

50.     Plaintiffs Brower, Talili, and Mistler bring this claim individually and on behalf of the members of the proposed class against Defendant.

51.     Plaintiffs Brower, Talili, Mistler, and the California Subclass members are consumers who purchased Affected Bed Linens for personal, family or household purposes.

Plaintiffs and class members are "consumers" as that term is defined by the CLRA in Cal. Civ. Code § 1761(d).

52.     The Affected Bed Linens that Plaintiffs Brower, Talili, Mistler, and other California class members purchased were "goods" within the meaning of Cal. Civ. Code § 1761(a).

53.     Defendant's actions, representations, and conduct violated and continue to violate the CLRA because they extend to transactions that intended to result, or which have resulted in, the sale of goods to consumers.

54.     Cal. Civ. Code § 1770(a)(4), prohibits "using deceptive representations or designations of geographic origin in connection with goods or services."  Cal. Civ. Code § 1770(a)(5), prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have …."  Cal. Civ. Code § 1770(a)(9) further prohibits "[a]dvertising goods or services with intent not to sell them as advertised."

55.     Defendant violated Cal. Civ. Code § 1770(a)(4), (a)(5), and (a)(9) by misrepresenting that the Affected Bed Linens were made with "100% Egyptian cotton" or "100% Long-Staple Egyptian Cotton," as alleged herein.

56.     Plaintiffs Brower, Talili, Mistler, and class members suffered injuries caused by Defendant because: (a) they would not have purchased Affected Bed Linens on the same terms if they knew that the Affected Bed Linens were not made from "100% Egyptian Cotton" or "100% Long-Staple Egyptian Cotton;" (b) they paid a substantial price premium compared to non-Egyptian cotton linens due to Defendant's representations that the Affected Bed Linens were made from "100% Egyptian Cotton" or "100% Long-Staple Egyptian Cotton;" and (c) the Affected Bed Linens did not have the characteristics, uses, or benefits as promised.

57.     On or about September 19, 2016, prior to filing this action, a CLRA notice letter was served on Defendant Welspun India which complies in all respects with California Civil Code § 1782(a).  The letter was sent via certified mail, return receipt requested, and advised Welspun

India that violated the CLRA and demanded that Welspun cease and desist from such violations and make full restitution by refunding the monies received therefrom.

58.     Wherefore, Plaintiffs Brower, Talili, and Mistler seek damages, restitution, and injunctive relief from each Defendant for its violations of the CLRA.

## COUNT II
### Violation Of California's Unfair Competition Law ("UCL"), California Business & Professions Code §§ 17200, *et seq.*

59.     Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

60.     Plaintiffs Brower, Talili, and Mistler bring this claim individually and on behalf of the members of the proposed class against Defendant.

61.     Defendant is subject to California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*  The UCL provides, in pertinent part: "Unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising …."

62.     Defendant violated the "unlawful" prong of the UCL by violating the CLRA, the FAL, the Textile Act, and 16 C.F.R. §§ 303.16(d) and § 303.27, as alleged herein.

63.     Defendant's misrepresentations and other conduct, described herein, violated the "unfair" prong of the UCL in that their conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous, as the gravity of the conduct outweighs any alleged benefits.

64.     Defendant violated the "fraudulent" prong of the UCL by making misrepresentations that the Affected Bed Linens were made from "100% Egyptian cotton or "100% Long-Staple Egyptian Cotton," as described herein.

65.     Plaintiffs Brower, Talili, Mistler, and the class members lost money or property as a result of Defendant's UCL violations because: (a) they would not have purchased the Affected Bed Linens on the same terms if they knew that the Affected Bed Linens were not made from "100% Egyptian Cotton" or "100% Long-Staple Egyptian Cotton;" (b) they paid a substantial price

premium compared to non-Egyptian cotton linens due to Defendant's representations that the Affected Bed Linens were made from "100% Egyptian Cotton" or "100% Long-Staple Egyptian Cotton;" and (c) the Affected Bed Linens did not have the characteristics, uses, or benefits as promised.

### COUNT III
**Violation Of California's False Advertising Law ("FAL"),**
**California Business & Professions Code §§ 17500, *et seq.***

66.     Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

67.     Plaintiffs Brower, Talili, and Mistler bring this claim individually and on behalf of the class members of the proposed class against Defendant.

68.     California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.*, makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public in this state, ... in any advertising device ... or in any other manner or means whatever, including over the Internet, any statement, concerning ... personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

69.     Defendant committed acts of false advertising, as defined by §§17500, *et seq.,* by misrepresenting that Affected Bed Linens were made from "100% Egyptian Cotton" or "100% Long-Staple Egyptian Cotton."

70.     Defendant knew or should have known through the exercise of reasonable care (i.e. pre-market testing) that its representations about the Affected Bed Linens were untrue and misleading.

71.     Defendant's actions in violation of §§ 17500, *et seq.* were false and misleading such that the general public is and was likely to be deceived.

72.     Plaintiffs Brower, Talili, Mistler, and class members lost money or property as a result of Defendant's FAL violations because: (a) they would not have purchased Affected Bed

Linens on the same terms if they knew that the Affected Bed Linens were not made from "100% Egyptian Cotton" or "100% Long-Staple Egyptian Cotton;" (b) they paid a substantial price premium compared to non-Egyptian cotton linens due to Defendant's representations that the Affected Bed Linens were made from "100% Egyptian Cotton" or "100% Long-Staple Egyptian Cotton;" and (c) the Affected Bed Linens did not have the characteristics, uses, or benefits as promised.

## COUNT IV
### Breach Of Express Warranty

73.     Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

74.     Plaintiffs Brower, Mistler, and Talili bring this claim individually and on behalf of the proposed Class against all Defendant.

75.     Defendant, as the manufacturer, marketer, distributor, and/or seller, expressly warranted that the Affected Bed Linens were "100% Egyptian Cotton" or "100% Long-Staple Egyptian Cotton."

76.     In fact, the Affected Bed Linens do not conform to the express warranty because they are not made from "100% Egyptian Cotton" or "100% Long-Staple Egyptian Cotton."

77.     As a direct and proximate cause of Defendant's breach of express warranty, Plaintiffs Brower, Mistler, Talili, and Class members have been injured and harmed because:  (a) they would not have purchased Affected Bed Linens on the same terms if they knew that the Affected Bed Linens were not made from "100% Egyptian Cotton" or "100% Long-Staple Egyptian Cotton;" (b) they paid a substantial price premium compared to non-Egyptian cotton linens due to Defendant's representations that the Affected Bed Linens were made from "100% Egyptian Cotton" or "100% Long-Staple Egyptian Cotton;" and (c) the Affected Bed Linens did not have the characteristics, uses, or benefits as promised.

78.     In 2016, Plaintiffs Brower and Talili sent a notice and demand letter on behalf of themselves and all similarly situated purchasers of Welspun-made bed linens to Welspun.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## COUNT V
### Unjust Enrichment

79.     Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

80.     Plaintiffs Brower, Mistler, and Talili bring this claim individually and on behalf of the proposed Class against all Defendant.

81.     Plaintiffs Brower, Mistler, Talili, and Class members conferred benefits on Defendant by purchasing the Affected Bed Linens.

82.     Defendant has been unjustly enriched in retaining the revenues derived from Plaintiffs Brower's, Mistler's, Talili's, and Class members' purchases of the Affected Bed Linens. Retention of those moneys under these circumstances is unjust and inequitable because Defendant misrepresented that the Affected Bed Linens were made from "100% Egyptian Cotton" or "100% Long-Staple Egyptian Cotton."  These misrepresentations caused injuries to Plaintiffs Brower, Mistler, Talili and Class members because they would not have purchased the Affected Bed Linens on the same terms if the true facts were known.

83.     Because Defendant's retention of the non-gratuitous benefits conferred on it by Plaintiffs Brower, Mistler, Talili, and Class members is unjust and inequitable, Defendant must pay restitution to Plaintiffs Brower, Mistler, Talili, and Class members for their unjust enrichment, as ordered by the Court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated in California, seek judgment against Defendant as follows:

a.   For an order certifying the classes described herein under Rule 23 of the Federal Rules of Civil Procedure;

b.   For an order declaring that Defendant's conduct violates the statutes referenced herein;

c.   For an order finding in favor of Plaintiffs, and the class members on all counts asserted herein;

1        d.   For compensatory, punitive, and statutory damages in amounts to be determined by

2            the Court and/or jury;

3        e.   For prejudgment interest on all amounts awarded;

4        f.   For an order of restitution and all other forms of equitable monetary relief;

5        g.   For an order awarding Plaintiffs and the Class their reasonable attorneys' fees, and

6            expenses;

7        h.   Damages, restitution, and/or disgorgement in an amount to be determined at trial;

8            and

9        i.   For such other and further relief as the Court may deem proper.

10                  **<u>DEMAND FOR TRIAL BY JURY</u>**

11      Plaintiffs demand a trial by jury of all issues so triable.

12

13   Dated:  May 24, 2019            Respectfully submitted,

14                              **BURSOR & FISHER, P.A.**

15                              By:    */s/ Joel D. Smith*

16                                  Joel D. Smith

17                            L. Timothy Fisher (State Bar No. 191626)

                                  Joel D. Smith (State Bar No. 244902)

18                            Frederick J. Klorczyk III (State Bar No. 320783)

                                  1990 North California Blvd., Suite 940

19                            Walnut Creek, CA  94596

20                            Telephone: (925) 300-4455

                                  Email:  ltfisher@bursor.com

21                                    jsmith@bursor.com

                                  fklorczyk@bursor.com

22                            **BURSOR & FISHER, P.A.**

23                            Scott A. Bursor (State Bar No. 276006)

                                  888 Seventh Avenue

24                            New York, NY  10019

                                  Telephone: (212) 989-9113

25                            Facsimile: (212) 989-9163

                                  E-Mail: scott@bursor.com

26

27                            *Attorneys for Plaintiffs*

28